## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**BRYAN A. MEARS,**
     **Petitioner,**

**v.**                                    **Case No. 3:05cv79/MCR/MD**

**JAMES A. MCDONOUGH,[1]**
     **Respondent.**

---

## ORDER and
## <u>REPORT AND RECOMMENDATION</u>

     **Before the court is an amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 4).  Respondent has filed a response (doc. 12) to which petitioner has replied (doc. 15).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.**

---

[1]James R. McDonough succeeded James Crosby as Secretary of the Florida Department of Corrections and is automatically substituted as respondent.  *See* Fed. R. Civ. P. 25(d)(1).

## BACKGROUND AND PROCEDURAL HISTORY[2]

At approximately 2:10 a.m. on September 9, 2000, petitioner was driving west on a two lane state road in the Warrington community to the west of Pensacola, Florida.  His vehicle crossed the center line and collided with a vehicle coming from the opposite direction.  Petitioner was severely injured, and the driver of the other vehicle died.  Petitioner was charged with DUI manslaughter.

## PRE-TRIAL MOTIONS

Prior to trial defense counsel filed several motions, five of which are relevant here:[3]

### 1.    Motion to dismiss information.

Defense counsel sought dismissal of the charges because the state had allegedly destroyed critical exculpatory evidence.  The thrust of counsel's argument was that Florida Highway Patrol (FHP) homicide investigator Corporal Marque Hendrix released the two vehicles involved in the crash (apparently to lienholders or insurance companies) when he knew or ought to have known that the vehicles contained exculpatory evidence and were necessary to an adequate defense of the case.  The vehicles were destroyed before defense counsel was able to hire an accident reconstruction expert, and the investigation was therefore compromised. The court held a hearing on the motion.  Cpl. Hendrix testified that he performed his investigation in the usual manner, observed the scene of the crash, took many photographs of the two vehicles, both at the scene and at an impound yard, and then

---

[2]The facts stated herein are those presented at trial and viewed in the light most favorable to the prosecution.  Due process requires a state to prove each element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  Where there are conflicting inferences and disputes exist, this Court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution. *Martin v. State of Alabama*, 730 F.2d 721,724 (11th Cir. 1984).  Although this court is not called on to address directly the sufficiency of the evidence, the evidence presented to the jury plays a major part in the court's analysis.

[3]As trial approached and discovery proceeded, these motions were amended and restated several times.  For the sake of simplicity, the synopsis here is an amalgam of the various motions in their various iterations.

released them according to FHP policy, which required that they be held for no more than five days (ex. B, pp.81-88).[4]  Petitioner's expert, James Anderson, P.E., testified that he was an experienced and qualified accident reconstruction expert, that he received all the investigatory materials from the state, including the homicide report and all the photographs, and that based on his investigation it was his professional opinion that the crash happened in the petitioner's lane and was entirely the fault of the decedent.  He further testified that there were some gouges or scrapes on the road, but that Cpl. Hendrix had not taken photographs of the underside of the vehicles, something that would have assisted in determining how the gouges were made.  Mr. Anderson also testified that he would have "preferred" to have the vehicles available so that he could do measurements for crush damage, since that would have helped him determine velocities.  He further testified that Cpl. Hendrix' report said variously that the crash was head-on, or at a 15 degree angle, or at a 30 degree angle.  A hands-on examination would have been helpful in determining the angle of impact, which would also have assisted in determining velocities.  The velocities, in turn, could be used in reconstructing the accident based on the final resting place of the vehicles, and would give a more solid foundation to Mr. Anderson's opinion.  Even so, Mr. Anderson conceded that while his investigation was "impaired," "I was still able to do an analysis, but not to the level of accuracy that I prefer or I think is necessary in this kind of situation."  (Ex. B, p. 47).

Based on the evidence presented and the argument of counsel, the court denied the motion to dismiss, finding first that there had been no bad faith on the part of Cpl. Hendrix in following FHP policy by releasing the vehicles and that there was no inherent bad faith in the policy itself, and second that Mr. Anderson was comfortable in giving his opinion, so there had been no showing of substantial prejudice (ex. B, p. 150).[5]

---

[4]Hereafter, all references to exhibits will be to those attached to doc. 12.

[5]The same issue was argued again before trial, with the same result (ex. B, p. 361).

2.      **Motion to suppress medical records.**

**Defense counsel also sought to suppress records from the hospital where petitioner was taken after the accident.  He contended that the state's service of a subpoena on the hospital did not meet the state's requirements for notice prior to service (ex. B, pp. 9-12).  Counsel further contended that the state should not be allowed to use the results of unfavorable blood tests because the legal requirements for taking blood had not been met.  The court held a hearing on the motion, and denied it as to the notice issue, finding that notice was sufficient.  The court reserved ruling on the admissibility of the hospital business records pending a proper predicate being laid at trial (ex. B, pp. 173-174).  This issue was resolved at trial, as will be discussed below.**

3.      **Motion in limine concerning blood alcohol test.**

**Shortly before trial defense counsel learned that the state intended to call an expert who would testify concerning the blood/alcohol test done at the hospital. Counsel contended that the test itself was inherently scientifically unreliable and should not be used.  At a hearing on the defendant's motion in limine a defense expert testified that the test done by the hospital was unreliable because petitioner's blood sample was taken after he had been given ringer's lactate intravenously, something that would skew the hospital's enzymatic test toward the positive.  The state argued that it had a witness who would explain how the ringer's lactate affected the test results, and that the results could be converted to a legally admissible figure.  The court reserved ruling on the motion pending a proper predicate to establish an exception to the hearsay rule (ex. B, pp. 186-187).  The issue was resolved at trial, as will be discussed below.**

4.      **Motion in limine concerning admission by defendant.**

**The hospital records contained a notation, written by the treating physician, that petitioner said he had fallen asleep.  At deposition the physician could not remember the case, did not know who told him that petitioner had fallen asleep, and could swear only that the notation was in his handwriting.  The court denied the**

motion in limine, but left the issue open if petitioner's counsel could present additional evidence at trial (ex. B, pp. 347-349Z).  This issue was also resolved at trial.

> 5.    Motion for continuance.

On the morning of trial defense counsel asked for a continuance, asserting that he was having difficulties obtaining a translation of certain documents.  A short time earlier trial counsel had taken the deposition of the state's toxicology expert, Leo Kadehjian, Ph.D.  During the deposition Dr. Kadehjian testified that in reaching his opinion he relied in part on published materials in the field, some of which (six out of thirty) were published in Germany.  When counsel received copies of the articles they were indeed written in German, and although the court allowed counsel to hire an interpreter, none could be found  in the short time before trial who was qualified to translate the technical language involved.  The state argued that the articles were not admissible substantively, that they could be used only for impeachment, and that in either event Dr. Kadehjian testified that the German articles had been published in the 1920's, and that subsequent research had substantiated them.  The court denied the motion for continuance without comment (ex. C, pp. 3-13).

## TRIAL

The case was tried to a jury.  Three FHP officers testified to what they observed at the scene of the accident.  Trooper Matthew Freeman identified some photographs as representing the scene as it existed when he arrived (ex. C, pp. 121-125).  Trooper Ricky O'Kelley testified that he examined the scene when he arrived, and felt that the physical evidence showed that the crash had happened in the eastbound lane, where the decedent's vehicle was traveling (ex. C, pp. 125-131).  Corporal Joseph Faircloth testified that he assisted Corporal Hendrix, the homicide investigator, at the scene.  He helped extricate the petitioner from his vehicle, and smelled the strong odor of alcohol coming from the vehicle (ex. C, pp. 131-136).

Corporal Hendrix testified that he arrived at the scene more than two hours after the crash.  The petitioner had already been taken to the hospital.  Cpl. Hendrix was a thirty year veteran of the FHP, and had been a homicide investigator for seventeen years.   After examining the scene, the vehicles, the positions of the vehicles, tire scuff marks, and debris, it was his conclusion that the vehicle driven by the petitioner was traveling west in the eastbound lane, and collided with the decedent's vehicle, which was traveling east in its correct lane.  The point of impact was four feet from the centerline into the eastbound lane.  He further testified that he examined the decedent's vehicle and determined that its headlight switch was in the "on" position.  He also agreed that the decedent had been tested for blood alcohol, and that the result was .246, more than three times the legal limit.

Dr. Sam Alliss, an emergency room physician, testified, over vigorous objection by defense counsel, that according to the hospital records he wrote "Patient states he fell asleep while driving." (Ex. C, p. 165). He admitted that he had no personal recollection of the event, and had no knowledge of why he may have written the note, whether petitioner told him that he had fallen asleep, or whether someone else in the emergency room told him (id.).

Dr. Kadehjian, the state's toxicologist, testified that the results of the blood alcohol test performed on petitioner's serum blood at the hospital could be converted to what the result would have been if the test had been done on whole blood, and that in his opinion, using a conversion factor of 1.14 with the hospital test results of .1758 , petitioner's blood alcohol level was .153.  Dr. Kadehjian conceded that the conversion factor he used was not the only one accepted in the scientific community, but that the generally accepted range was from 1.13 to 1.15.  He also testified that the lowest and highest conversion factors found in the scientific literature, .74 and 1.59, would still convert petitioner's blood alcohol level to greater than .08, the legal limit for driving (ex. C, pp. 203-213).

Petitioner testified that he and his wife were having marital difficulties and that he went out on the night of the crash to "unwind, decompress a little bit." (Ex. C, p.

229).  He ate some dinner and then drove to Pensacola Beach where he drank two rum punches and three beers over a period of more than  six hours (ex. C, pp. 232-239).  When he left the beach he was not intoxicated.  He drove a total of about 25 miles through Gulf Breeze and Pensacola and was well past Pensacola on the west side of town when the crash occurred.  The next thing he knew the decedent's car was in front of him, without headlights, and he tried to evade but the crash occurred (Ex. C, pp. 239-251).  He admitted he may have told someone he fell asleep, but that was because an off-duty EMS person (who was from out of town) told him he was at Dog Track Road, more than a mile further down the road, and he knew he had not gone that far when the crash occurred.  He simply concluded that if he was truly at Dog Track road as he was told, he must have fallen asleep.  However, he later learned that the crash was not at Dog Track Road, but was exactly where he thought it was, and therefore could not have fallen asleep (ex. C, pp. 252-255).

The defense presented James Anderson as their accident reconstruction expert.  Mr. Anderson testified that in his opinion the accident happened in the petitioner's lane, not in the decedent's, and that there was nothing the petitioner could have done to avoid the crash (ex. C, pp. 275-324).  The defense also presented Patrick Demers, a toxicologist, who testified that the blood test performed by Baptist was meaningless because petitioner's blood was drawn after he had been given lactated ringers fluid intravenously.  Ringers lactate is well known in the scientific community to affect adversely the precision of blood serum alcohol tests, rendering them totally unreliable (ex. C. pp. 348-363).

The state re-called Dr. Kadehjian, who discounted  Mr. Demers' testimony, explaining that the lactate interference with enzyme testing occurs only at very high levels, none of which, in his opinion, were present here.

The jury found petitioner guilty as charged.  He was sentenced to five years imprisonment, followed by ten years of probation.  Petitioner appealed his conviction and sentence unsuccessfully.  No motion for post-conviction relief pursuant to Fla.R.Crim.P. 3.850 was filed. Petitioner now seeks federal habeas relief

based on trial court error.  The respondent concedes that the instant petition is timely, and that the issues raised were properly exhausted in the state courts (doc. 12, p. 2).[6]

## STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

---

[6]In Ground Two, which claims denial of due process, petitioner also alludes to ineffective assistance of counsel.  However, it is not clear that he is claiming ineffective assistance of counsel in the usual sense.  Rather, as will be shown in the discussion below, it appears that he is saying he was denied effective assistance of counsel, not by counsel's deficient performance, but because the court forced him to go to trial when the state had just presented a witness who relied for his opinion on materials printed in German, which could not be translated, making counsel unprepared through no fault of his own.  To the extent that petitioner is claiming ineffective assistance *caused by his attorney's deficiencies* independent of the German language issue, any such claim is procedurally barred, because it was never presented to the state courts for consideration.  *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

120 S.Ct. at 1523 (O'Connor, J., concurring).  Under the test just described a habeas court does not examine the State court's ruling to see if it is correct, but examines it only to see if it is reasonable.  More recently, in *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Id.*, 123 S.Ct. 1172.   The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are

materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer,* 123 S.Ct. at 1173 (quoting *Williams v. Taylor,* 529 U.S. at 405-06, 120 S.Ct. at 1519-20).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases--indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams*, 529 U.S. at 405-06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.  *Holland v. Jackson*, 542 U.S. 649, 652, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001); *see also Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004) (A state court decision involves an unreasonable application of clearly established

Federal law if the State court decision "identifies the correct governing Supreme Court legal principle . . . but . . . 'refuses to extend the governing principle to a context in which the principle should have controlled.'" (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000))).

Section 2254(d)(1) requires more than mere error, and more even than clear error on the part of the State court before federal habeas relief may be issued. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) ("We may not grant respondent's habeas petition, however, if the state court simply erred. . . ."); *Lockyer, supra*, 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Early v. Packer*, 537 U.S. at 11, 123 S.Ct. at 366 (State court "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law. . . ."); *Williams, supra*, 529 U.S. at 410-12, 120 S.Ct. at 1522-23 (The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion.").

Only if the federal habeas court finds the State court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims. *Neelley*, 138 F.3d 917. Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides for a "highly deferential standard of review" for factual determinations made by a state court).


## PETITIONER'S GROUNDS FOR RELIEF

1.   <u>Denial of Due Process - destruction of evidence</u>.

Petitioner first contends that critical evidence - the two vehicles involved in the crash - were destroyed by the state, thereby prejudicing him.

A.  <u>Clearly Established Federal Law.</u>

Supreme Court law on this issue is well settled.  In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281, the Supreme Court rejected the finding of the Arizona Court of Appeals that where the police allow destruction of evidence that could absolve the defendant, a due process violation has occurred.  In *Youngblood* the police had not properly preserved a sexual assault kit and articles of clothing, resulting in expert testimony that nothing in the kit or the clothing could either identify the defendant as the perpetrator, nor could it exonerate him.  On being convicted the defendant claimed a due process violation, relying in part on *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which held that the state has the positive duty to disclose and turn over all evidence potentially favorable to the accused.   The *Youngblood* court distinguished *Brady*, holding that the more relevant authority was *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d  413 (1984), in which the Court held that law enforcement's failure to

preserve breath alcohol samples did not constitute a constitutional violation because the officers were following their standard procedure, there was little likelihood that testing the preserved samples would have changed the result, and defendant had alternative means of demonstrating his innocence. The *Youngblood* Court therefore held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. 488 U.S. at 58, 109 S.Ct. at 337.

B. Federal Review of State Court Decision.

The trial court heard testimony on petitioner's motion to dismiss the information. Applying *Youngblood* to the evidence presented, the court found that because petitioner's expert conceded that he was comfortable in his ability to form an opinion based on the photographs and other materials provided by the state, there was no prejudice, and further that there was no bad faith on the part of the FHP (ex. A, p. 150). The state appellate court affirmed without written opinion.

Petitioner tries to distinguish *Youngblood* by pointing to facts that arose after the vehicles had been destroyed. He asserts that his expert could have performed a more thorough investigation if he had been able to see and measure the vehicles, and particularly the undersides so that he could answer questions concerning gouges found in the road. Thus, he says, *Brady* compelled preservation of the vehicles.

"[T]he applicability of the bad-faith requirement in *Youngblood* depend[s] not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between "material exculpatory" evidence and "potentially useful" evidence. *Illinois v. Fisher*, 540 U.S. 544, 549, 124 S.Ct. 1200, 1203, 157 L.Ed.2d 1060 (2004). Where the evidence destroyed is "at best [only] 'potentially useful' evidence, *Youngblood's* bad-faith requirement applies. *Id.* "To meet th[e] standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence

by other reasonably available means." *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). The record fails to show that there was anything about the vehicles that gave them apparent exculpatory value. Moreover, petitioner's expert did not claim that the vehicles provided material exculpatory evidence, only that they would have proven useful to him in buttressing his opinions. Petitioner's expert also conceded that he was given the homicide report and all photographs. Thus, petitioner clearly had "comparable evidence."

Because petitioner has failed to show that the vehicles constituted material exculpatory evidence, *Youngblood's* bad-faith requirement applies. Petitioner has not shown bad faith. The investigating officer released the vehicles after he had examined and photographed them in accordance with FHP procedure. He felt that the wrecked vehicles had served their useful purpose, that their condition had been preserved by multiple photographs, and that there was no reason to keep them. The state court's ruling did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1); *Williams, supra.* Nor was the state court's decision based on an unreasonable determination of the facts in light of the evidence presented to it. Petitioner is not entitled to federal habeas relief, and the writ should not issue.

2.  <u>Denial of Due Process and Sixth Amendment Rights - denial of motion for continuance and inability to confront state witness.</u>

As his second ground for relief petitioner contends that he was denied his Sixth Amendment right to confront the witnesses against him because the court denied his motion for continuance when his attorney could not find a translator for certain articles, written in German, upon which the state's expert relied in reaching his opinions on the issue of the reliability of the blood/alcohol test.

A.  <u>Clearly Established Federal Law.</u>

This claim contains two parts: denial of a motion for continuance, and denial of the right to confront a witness. As to the first, trial judges are given broad discretion on matters of continuance. "[O]nly an unreasoning and arbitrary

'insistence upon expeditiousness in the face of a justifiable request for a delay' violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12, 103S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983)(quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964).  "There are no mechanical tests for deciding when denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar, supra*, 376 U.S. at 589, 84 S.Ct. at 850)(holding that five days' notice was sufficient for a defendant to hire a lawyer and prepare for a hearing in a summary criminal contempt proceeding).  Thus, the test is whether the trial court abuses its broad discretion by acting arbitrarily under the facts and circumstances of the case before it.

Petitioner's due process claim is founded on his claim that the trial court's denial of his motion for continuance when he could not read the German article relied on by the state's expert toxicologist violated his right of confrontation.  The Sixth Amendment provides for an accused's right "to be confronted with the witnesses against him."  This right is denied when the accused is denied the right to cross-examine a witness. *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)(holding that a confession to law enforcement by a co-defendant implicating the accused is inadmissible because the confession cannot be cross-examined)(plurality opinion); *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)(holding that the Sixth Amendment prohibits the introduction of "testimonial" statements that implicate the accused absent the right of cross-examination).[7]

Relevant to this case, the Supreme Court held in *Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) that there was no due process violation when an expert witness was allowed to testify concerning his conclusions, even though he could not remember the reasons for those conclusions.  Specifically, the

---

[7]The Court left "for another day" defining limits of what constitutes "testimonial" statements, but noted that the term includes, at the very least, prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations.  541 U.S. at 68, 124 S.Ct. at 1374.

expert in *Fensterer* opined that a human hair present on a piece of the state's evidence had been forcibly removed.  There are three indicators of forcible removal of a hair, but the expert could not remember which indicator he had seen when he examined the hair and noted its forcible removal.  The defendant argued that he was denied the right to cross-examine the expert because the expert relied on evidence that was no longer available and could not be challenged.  The Supreme Court disagreed, holding that the expert's testimony was admissible.  The Court pointed out that the expert was fully cross-examined, even to the point of having to admit that he could not remember the basis for his opinion.  Moreover, the defense was able to show through its own expert that the state's expert had relied on a baseless theory.

B. Federal Review of State Court Decision.

This claim was presented to the state court on direct appeal.  Petitioner argued that his due process and confrontation rights were abridged because his attorney could not obtain translations of the German articles upon which the state's expert relied, thereby seriously impeding his ability to challenge the expert's testimony.  The appellate court affirmed without written opinion (ex. L, appendix).

There are two flaws in petitioner's argument.  The first goes to perspective.  According to counsel's argument to the trial court, Dr. Kadehjian testified at his deposition, and generally affirmed at trial, that he relied on published reports concerning formulas for converting serum alcohol results to blood alcohol results.[8]  There were between twenty and thirty such articles, four to six of which were in German (ex. C, pp. 206-208).  When defense counsel raised the issue during Dr. Kadehjian's testimony at trial (the pre-trial motion was discussed earlier), the court overruled the objection and motion for mistrial or continuance, stating that the expert had to stand on his own opinion, not present any other works to bolster his testimony.  Defense counsel could then challenge him on the foundation of his

[8] Dr. Kadehjian's deposition transcript is not in the record before this court.  All that is known about that testimony is what defense counsel represented to the trial court in his argument requesting a continuance.

opinion (ex. C, p. 208). In fact, defense counsel's cross-examination was very brief, and was limited to establishing that no blood alcohol test had been done, that Dr. Kadehjian simply used a conversion factor in reaching his opinion, and that there is a range of conversion factors used by different experts (ex. C, pp. 209-211). Thus, if indeed there were twenty studies concerning the subject, four of which were in German, defense counsel obviously found nothing useful to him in the sixteen that were in English. Then, petitioner presented his own expert, who disagreed with Dr. Kadehjian. It was for the jury to decide which expert was the more credible.

This is not significantly different from the *Fensterer* case. There, an expert witness could not remember a critical piece of the reason upon which he based his opinion. The *Fensterer* Court noted that this did not leave the defense helpless, since the argument that a witness cannot remember crucial facts is powerful, "calling to the attention of the fact finder the reasons for giving scant weight to the witness' testimony." *Fensterer, supra,* 474 U.S. at 22, 106 S.Ct. at 295.

Interestingly, petitioner's counsel did not question the state's expert concerning his reliance on the German articles. He did not, for example, ask if four of the articles the expert relied on were written in German, or make any attempt to examine the expert's command of that language. While that approach would have been less than ideal, the Confrontation Clause does not guarantee perfection, only an opportunity for a full and fair cross-examination. *Id.* Clearly, petitioner had every opportunity to confront the state's case, and did so, except only as to the mysterious German articles.

The content of those articles goes to the second flaw in petitioner's case: There is a complete lack of proof of prejudice. That is, petitioner cannot prove prejudice because he cannot show that having an English translation of the German studies would have affected the outcome of the case. As far as this court has been shown, the German articles have never been translated into English, from the date of the verdict in August 2002 until the appellate court affirmed the conviction in March 2004, during which time petitioner was represented by counsel. So this court,

like the state courts, is left to speculate that if only petitioner's counsel had been given time to translate the German articles, the proverbial smoking gun for the defense would have appeared and the result would have been different.  Speculation will not support the issuance of the writ.  The state court's ruling did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1); *Williams, supra*.  Petitioner is not entitled to federal habeas relief, and the writ should not issue.

3.   <u>Denial of Due Process - admission of hearsay evidence.</u>

Petitioner next contends that the trial court erred in allowing into evidence the hospital notation that petitioner told someone he had fallen asleep at the wheel.  When petitioner sought exclusion of the emergency room record on hearsay grounds, the trial court ruled that the record was admissible under the Florida Evidence Code because it fell under the business records exception (ex. C, p. 185).  The appellate court affirmed without written opinion.

This is a matter of state evidentiary law, not constitutional concern.  Federal habeas  relief is available to correct only constitutional injury.  28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479-80, 116 L.Ed.2d 385 (1991)(errors that do not infringe upon a defendant's constitutional rights provide no basis for federal habeas corpus relief); *Wainwright v. Goode*, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983); *Barclay v. Florida*, 463 U.S. 939, 958-659, 103 S.Ct. 3418, 3429, 77 L.Ed.2d 1134 (1983) ("Mere errors of state law are not the concern of this court . . . unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution.")(citations omitted); *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 2976, 73 L.Ed.2d 1361 (1981); *Carrizales v. Wainwright*, 699 F.2d 1053 (11th Cir. 1983).  Questions of state law and procedure "rarely raise issues of federal constitutional significance. [A] state's interpretation of its own laws provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."  *Tejada v. Dugger*, 941 F.2d 1551 (11th Cir. 1991), *cert. denied*, 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992) (quoting *Carrizales, supra*).

"This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is couched in terms of equal protection and due process."  *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988).

State law issues may be reviewed in this federal forum only when the alleged errors were "so critical or important to the outcome of the trial to render the entire trial fundamentally unfair."  *Tejada v. Dugger*, 941 F.2d at 1560.  The Supreme Court "ha[s] defined the category of infractions that violate 'fundamental fairness' very narrowly" *Estelle*, 502 U.S. at 352, 110 S.Ct. 668.  The instant case is not one in which there were such critical errors, if indeed there were any errors, that a constitutional violation is apparent.  Petitioner's admission was contained in an emergency room record.  The record was prepared during the handling of a hospital patient (petitioner) on an emergency basis.  At trial, the records custodian for the hospital laid the foundation required by section 90.803(6) of the Florida Evidence Code.  Petitioner concedes that the document was a business record, and does not challenge its authenticity (ex. E, p. 34).  Although Dr. Alliss did not recall who took petitioner's admission, its reliability was assured because it was entered as a regular part of the process of preparing the business record.[9]  Any inability to identify the particular person to whom the admission was made would go to the credibility of the record, not its admissibility.  Because petitioner has not established that admission of the evidence was error, he has correspondingly failed to demonstrate that admission of the hospital record rendered his trial fundamentally unfair.  Petitioner is not entitled to federal habeas relief on this claim.

4.    Denial of Due Process - prosecutorial misconduct.

Finally, petitioner contends that the prosecution improperly bolstered the testimony of the FHP investigator by arguing that the Trooper had no particular reason to accuse the petitioner.  Counsel's objection to that argument was

---

[9] A business record is deemed trustworthy because the entries are made in a routine manner as a part of the regular practice of the business.  There is thus no inherent motive to falsify the record.

sustained, but no curative instruction was given in spite of counsel's request.

### A. Clearly Established Federal Law.

It is long established Supreme Court law that prosecutors must refrain from improper methods calculated to produce a wrongful conviction; they may strike hard blows but are not at liberty to strike foul ones. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 74 L.Ed.2d 1314 (1935). "A lawyer shall not . . . state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused" and shall not "use arguments calculated to inflame the passions or prejudices of the jury." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)(citing Model Rules of Professional Conduct, Rule 3.4(e)(1984); Code of Professional Responsibility, DR 7-106(c)(4) (1980); ABA Standards for Criminal Justice: 3-5.8(b)(2d Ed. 1980))).

In applying the various professional standards to the conduct of attorneys who appear before them, courts must not lose sight of the reality that "[a] criminal trial does not unfold like a play with actors following a script." *United States v. Young*, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985) (quoting *Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976)). "[I]n the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused." *Id*. (citing *Dunlop v. United States*, 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799 (1897)).

Challenges to allegedly improper prosecutorial comments are not infrequent. However, in evaluating a prosecutorial indiscretion:

> it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

*Darden, supra* (internal citations omitted); *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Inappropriate prosecutorial comments, standing alone,

do not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.  Instead, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error.  *Young*, 470 U.S. at 11, 105 S.Ct. at 1044.  In determining whether a prosecutor's improper comments were so egregious as to render the proceeding fundamentally unfair, the court will consider the remedying effects, if any, of the trial court's instructions to the jury and the evidence of guilt.  *Cargill v. Turpin*, 120 F.3d 1366, 1379 (11th Cir. 1997).  Weight is also given to the trial judge's assessment of any prejudicial effect the comments may have had.  *United States v. Simon*, 964 F.2d 1082 (11th Cir. 1992).

B. <u>Federal Review of State Court Decision.</u>

In the instant case, during final argument the prosecutor told the jury that "the highway patrol had no particular reason to accuse [the petitioner] Mr. Mears, because - -." (Ex. C, p. 587).  Defense counsel objected, arguing that the prosecution was vouching for the credibility of a witness.  The court sustained the objection, but denied counsel's motion for a curative instruction, stating that counsel's objection timely stopped the end of the prosecutor's statement, and that any curative instruction would do more harm than good (ex. C, p. 589).  The court instructed the prosecutor to change his argument, and the matter was not mentioned again.  At the beginning of closing arguments, and again during closing, the court told the jury that what lawyers say is not evidence (ex. C, pp. 575, 634).  The court also instructed the jury that they must base their decision solely on the evidence produced at trial (ex. C, pp. 640, 642).  Petitioner raised the issue on appeal, but the state appellate court affirmed.

Taken in the context of the entire trial, the prosecutor's statement that the FHP had no particular reason to accuse the petitioner, while improper, was not so egregious as to render the proceeding fundamentally unfair, nor did it so infect the trial with unfairness as to make the resulting conviction a denial of due process.  The state court's ruling did not result "in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1); *Williams, supra*. Petitioner is not entitled to federal habeas relief, and the writ should not issue.

Accordingly, it is ORDERED:

The clerk shall change the docket to reflect that James R. McDonough has been substituted as respondent in this cause.

And it is respectfully RECOMMENDED:

That the 28 U.S.C. § 2254 amended petition for writ of habeas corpus (doc. 4), challenging the conviction and sentence in *State of Florida v. Bryan A. Mears* in the Circuit Court of Escambia County, Florida, case no. 00-4953, be DENIED, that this cause be DISMISSED, and that the clerk be directed to close the file.

At Pensacola, Florida, this 7th day of February, 2007.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof. __Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.__ A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).